[Cite as *Senco Brands, Inc. v. Ohio Dept. of Job & Family Servs.*, 2016-Ohio-4769.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Senco Brands, Inc., | : | |
| Appellant-Appellant, | : | |
| | : | No. 15AP-796 |
| v. | : | (C.P.C. No. 15CVF03-2641) |
| Ohio Department of Job and Family Services et al., | : | (REGULAR CALEDAR) |
| | : | |
| Appellees-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on June 30, 2016

**On brief:** *Frost Brown Todd LLC, Frank J. Reed, Jr.,* and *Alana R. Shockey*, for appellant. **Argued:** *Frank J. Reed, Jr.*

**On brief:** *Michael DeWine*, Attorney General, and *Eric A. Baum*, for appellee Ohio Department of Job and Family Services. **Argued:** *Eric A. Baum.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Appellant, Senco Brands, Inc. ("Senco Brands"), appeals from a judgment of the Franklin County Court of Common Pleas in favor of appellee, Ohio Department of Job and Family Services ("ODJFS"), affirming a determination by the Ohio Unemployment Compensation Review Commission ("UCRC") that Senco Brands is a successor-in-interest to Senco Products, Inc. ("Senco Products") for purposes of determining Senco Brands' unemployment contribution rate as an Ohio employer. For the reasons that follow, we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   On May 7, 2009, SENCORP and its subsidiary, Senco Products, as sellers, executed an asset purchase agreement whereby some of Senco Products' assets were sold to Senco Holdings and Wynnchurch Capital.  Wynnchurch Capital subsequently named Senco Brands, a newly created company, as its designee.[1]  As a result, Senco Brands became both the buyer and an Ohio employer.

{¶ 3}   The following day, May 8, 2009, Senco Products filed a petition for bankruptcy in the United States Bankruptcy Court, Southern District of Ohio, Western Division, pursuant to Title 11 of the Bankruptcy Code.  Senco Products also filed a motion for approval of the sale of assets pursuant to 11 U.S.C. 363(f).  On July 2, 2009, the bankruptcy court approved both the petition for bankruptcy and approved the sale of assets.  The order approving the sale of assets ("bankruptcy order"), provides that the trustee is authorized to sell property of the debtor, pursuant to 11 U.S.C. 363(f), "free and clear of any interest in such property of an entity other than the estate."[2]

{¶ 4}   Senco Brands subsequently began filing quarterly wage reports with ODJFS.  Senco Brands also submitted a "Report to Determine Liability-Transfer of Business."  Senco Brands now claims that "the company inadvertently and erroneously reported that it had acquired all of Senco Products Inc.'s Ohio trade or business–by simply checking the wrong box on that form."  (Emphasis sic.)  (Appellant's brief at 7.) ODJFS interpreted the information in the form as an admission by Senco Brands that it was the successor-in-interest to Senco Products for purposes of Senco Brands' unemployment payroll tax rate.

{¶ 5}   Accordingly, on September 9, 2009, ODJFS issued a "Determination of Employer's Liability and Contribution Rate" assigning Senco Brands an unemployment payroll tax rate of 5.1 percent for calendar year 2009, rather than the 2.7 percent rate applied to new employers.  The higher rate was the result of ODJFS applying Senco Products' unemployment experience in the calculation of Senco Brands rate as a successor-in-interest to Senco Products.  Senco Brands began paying unemployment

---

[1] The asset purchase agreement identifies SENCO Holdings as the "buyer," Wynnchurch Capital Partners, Inc. as "parent," and SENCORP, Senco Products, Inc., and a number of SENCORP subsidiaries as "sellers."

[2] The bankruptcy order identifies the "debtors" in the Chapter 11 proceedings.  The debtors are the same corporate entities identified as "sellers" in the asset purchase agreement.

insurance tax premiums at the rate of 5.1 percent and continued to pay premiums at that rate until 2012 when it "learn[ed] of its reporting error [in] 2012." (Appellant's brief at 8.) In a letter dated December 7, 2012, Senco Brands requested a review and reversal of the determination that it is a successor-in-interest to Senco Products.

{¶ 6} ODJFS subsequently determined that Senco Brands' request was untimely and refused to review Senco Brands' rate. Senco Brands availed itself of the appeals process in an effort to overturn the ODJFS determination. The appeal eventually reached this court in case No. 13AP-394. While the appeal was pending, the parties entered into a "Consent Judgment and Agreed Final Order and Entry," whereby the case was remanded to the UCRC for further proceedings on Senco Brands' request for review.

{¶ 7} On November 18, 2014, UCRC conducted an evidentiary hearing on the matter. As a result of the hearing, the UCRC's hearing officer determined that Senco Brands was not a successor-in-interest to Senco Products under R.C. 4141.24(F) but that Senco Brands was a successor-in-interest to Senco Products, pursuant to R.C. 4141.24(G)(1), because Senco Brands and Senco Products were under "substantially common management" after the transfer of Senco Products' business. (Mar. 4, 2015 UCRC Decision at 7.) The hearing officer reached this conclusion notwithstanding the conclusion in the bankruptcy order that Senco Brands acquired Senco Products' assets free and clear of any competing interest in the property.

{¶ 8} Senco Brands appealed the UCRC decision to the Franklin County Court of Common Pleas, pursuant to R.C. 4141.26(D)(2), arguing that UCRC erred and abused its discretion in upholding the ODJFS determination that Senco Brands was a successor-in-interest to Senco Products. The trial court affirmed the UCRC order. The court found that under the rule of law in *Michigan Emp. Sec. Commission v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1145 (6th Cir.1991), the bankruptcy order did not preempt the ODJFS determination that Senco Brands was a successor-in-interest to Senco Products. The trial court further found that there was competent, credible evidence in the record to support UCRC's finding that Senco Brands and Senco Products were under substantially common management for purposes of R.C. 4141.24(G)(1). Finally, the trial court held that UCRC did not abuse its discretion by quashing Senco Brands' subpoena seeking ODJFS' records pertaining to several other Ohio employers.

{¶ 9} Senco Brands timely appealed to this court from the trial court decision.

## II.  ASSIGNMENTS OF ERROR

{¶ 10}  Senco Brands assigns the following errors:

> [1.] The Franklin County Court of Common Pleas erred when it failed to find that 11 U.S.C. Section 363(f) preempts the ODJFS determination.

> [2.] The Franklin County Court of Common Pleas erred when it found Senco Brands was a successor-in-interest under R.C. 4141.24(G).

> [3.] The Franklin County Court of Common Pleas erred in upholding the decision of the Unemployment Compensation Review Commission which was not supported by reliable, probative, and substantial evidence.

> [4.] The Franklin County Court of Common Pleas erred when it upheld the Unemployment Compensation Review Commission denial of Senco Brand's Subpoena and Motion for a Protective Order.

## III.  STANDARD OF REVIEW

{¶ 11}  The standard of review for appeals from decisions of the UCRC is found in R.C. 4141.26(D)(2), which states that a common pleas court may affirm UCRC's decision where it is "supported by reliable, probative, and substantial evidence and is in accordance with law."  A court of appeals' review of an administrative agency's ruling "is more limited than that of a common pleas court.  This court does not weigh the evidence." *Kate Corp. v. Ohio State Unemp. Comp. Rev. Comm.*, 10th Dist. No. 03AP-315, 2003-Ohio-5668, ¶ 7, citing *Childs v. Oil & Gas Comm.*, 10th Dist. No. 99AP-626 (Mar. 28, 2000), citing *Lorain City Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257 (1988).  "Although appellate courts are not permitted to make factual findings or weigh the credibility of the witnesses, the court does have a duty to determine whether the board's decision is supported by the evidence in the record." *Pennex Aluminum Co., LLC v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-446, 2014-Ohio-5308, ¶ 10, citing *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 696 (1995).

{¶ 12}  Thus, a court of appeals determines only if the common pleas court abused its discretion. *Tzangas* at 696-97.  In successor-in-interest cases, "this court has defined 'abuse of discretion' as connoting more than an error in judgment, but implying a decision

that is without a reasonable basis and clearly wrong." *All Star Personnel, Inc. v. Unemp. Comp. Rev. Comm.*, 10th Dist. No. 05AP-522, 2006-Ohio-1302, ¶ 13, quoting *WLS Stamping Co., Inc. v. Admr., Ohio Bur. of Emp. Servs.*, 10th Dist. No. 93AP-278 (Dec. 14, 1993), citing *Angelkovski v. Buckeye Potato Chips Co.*, 11 Ohio App.3d 159 (10th Dist.1983).

{¶ 13} However, where a R.C. 4141.26(D)(2) appeal raises legal issues, our review is de novo. *Slats & Nails Pallets, Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-690, 2015-Ohio-1238, ¶ 8, citing *Hayward v. Summa Health Sys./Akron City Hosp.*, 139 Ohio St.3d 238, 2014-Ohio-1913, ¶ 23.

## IV. LEGAL ANALYSIS

### A. Preemption

{¶ 14} In its first assignment of error, Senco Brands argues that the trial court erred when it failed to find that 11 U.S.C. 363(f) and the bankruptcy order preempted the ODJFS determination that Senco Brands is a successor-in-interest. We disagree.

{¶ 15} "There are generally three tests for federal preemption. Congress may expressly preempt state authority in a given area. *Jones v. Rath Packing Co.* (1977), 430 U.S. 519. Absent express preemption, where state law conflicts with or frustrates federal law or its objectives, federal law may supersede state law. *Florida Lime & Avocado Growers, Inc. v. Paul* (1963), 373 U.S. 132. Additionally, if a scheme of federal regulations is so pervasive as to leave no room for the states to supplement it, federal preemption may be found. *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218." *State ex rel. Miller v. Indus. Comm.*, 26 Ohio St.3d 110, 111 (1986).

{¶ 16} In this instance, Senco Brands argues that the ODJFS determination that Senco Brands is a successor-in-interest to Senco Products conflicts with 11 U.S.C. 363(f) and the bankruptcy order. Under 11 U.S.C. 363(f), "[t]he trustee may sell property under subsection (b) or (c) of this section *free and clear of any interest in such property* of an entity other than the estate." (Emphasis added.) The bankruptcy order provides, in relevant part, as follows:

> 9. Pursuant to 11 U.S.C. § 363(b) and 363(f), the Assets shall be transferred to the Buyer upon consummation of the Asset Purchase Agreement (the "Closing Date") *free and clear of all Interests and Encumbrances * * * of any kind or nature whatsoever including, but not limited to, Interests or

> Encumbrances in respect of * * * unemployment * * * related claim[s] * * * [or] state unemployment compensation laws.

(Emphasis added.)  (UCRC Record of Proceedings, Ex. C at 11-12.) [3]

> 31. The Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors. * * * Without limiting the generality of the foregoing, * * * the Buyer *shall have no successor liabilities* * * * of any kind of character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes * * * in any way relating to the operation of the business prior to the Closing Date.

(Emphasis added.)  *Id.*, Ex. C at 21.[4]

> 32. [U]nder no circumstances shall the Buyer be deemed a successor of or to the Debtors for any Interest or Encumbrances against or in the Debtors or the Assets of any kind or nature whatsoever.

*Id.*, Ex. C at 22.

{¶ 17} Senco Brands contends that the bankruptcy order preempts the ODJFS determination under the rule adopted in several federal circuits.  *See, e.g., Mass. Dept. of Unemp. Assistance v. OPK Biotech, LLC*, 484 B.R. 860 (B.A.P. 1st Cir.2013); *In re Chrysler, LLC*, 576 F.3d 108 (2d Cir.2009); *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir.2003); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir.1996); and *Precision Industries Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537 (7th Cir.2003).   In these circuits, the term "any interest in the [debtor's] property," as used in 11 U.S.C. 363(f), is defined broadly to include any obligations that may arise from the property being sold.  *Id.*  According to Senco Brands, Senco Products' unemployment compensation experience rating was an "interest" in

---

[3] Section N. of the bankruptcy order also provides: "**Free and Clear**.  The Debtors may sell the Assets * * * free and clear of all Interests and Encumbrances * * * because, with respect to each creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied." (Emphasis sic.)  (UCRC Record of Proceedings, Ex. C at 6.)

[4] Section T. of the bankruptcy order also provides: "**Buyer not an Insider and No Successor Liability**.  * * * [T]here is no continuity of enterprise between Debtors and Buyer, Buyer is not a mere continuation of the Debtors or the Debtors' estates, and Buyer does not constitute a successor to the Debtors or the Debtors' estates.  (Emphasis sic.)  (UCRC Record of Proceedings, Ex. C at 8.)

Senco Products' property and, pursuant to 11 U.S.C. 363(f) and the bankruptcy order, Senco Brands purchased such property free and clear of the Senco Products' experience rating. Senco Brands claims that the ODJFS determination that Senco Brands is a successor-in-interest to Senco Products is preempted because it conflicts with 11 U.S.C. 363(f) and the bankruptcy order.

{¶ 18} ODJFS argues that the determination that Senco Brands is a successor-in-interest does not conflict with 11 U.S.C. 363(f) and the bankruptcy order because under *Wolverine*, a debtor's experience rating is not an "interest" in the debtor's property that is extinguished by a sale of the debtor's assets pursuant to 11 U.S.C. 363(f). For the reasons that follow, we agree with the approach to preemption adopted by the Sixth Circuit in *Wolverine.*

{¶ 19} The debtor in *Wolverine* confirmed a plan that sold a radio station to Patten Corporation ("Patten"). Patten then assigned the radio station to JOSI Broadcasting Company ("JOSI"). *Id.* at 1135. The purchase agreement between Wolverine and Patten stated in paragraph 11(g): "WOLVERINE will hold at Closing good and marketable title to all property and assets listed or described in attached Exhibits A *free and clear* of any mortgages, liens, pledges, charges, security agreements, claims or encumbrances." (Emphasis added.) *Id.* The purchase agreement also stated at paragraphs 12(c), 17, and 23, respectively: "It is specifically understood that PATTEN by implication, by operation of law or any equitable proceedings, or otherwise, does not assume any local, state or federal tax liabilities or any other liabilities and obligations of WOLVERINE, as may result from the sale of its assets and property to PATTEN." *Id.*

{¶ 20} The Michigan Employment Security Commission ("MESC") subsequently informed JOSI that as a statutory successor-in-interest to the debtor, it would assess statutory payments by reference to the debtor's experience rating. *Id.* at 1136. This resulted in JOSI's rate being significantly higher than the new employer rate. Because the debtor was concerned that JOSI would assert indemnity rights under the sales contract, the debtor asked the bankruptcy court to enjoin MESC from applying debtor's contribution rate to JOSI. *Id.* at 1137. Invoking the substantive right created by 11 U.S.C. 363(f), the debtor asked the bankruptcy court to enforce the order that provided for the sale of the debtor's assets "free and clear of any mortgages, liens, pledges, charges, security agreements, claims or encumbrances." *Id.* at 1135.

{¶ 21} The bankruptcy court issued an order prohibiting MESC from assigning the unemployment benefits experience rating of the debtor to the debtor's statutory successor. *Id.* at 1134. The United States District Court for the Eastern District of Michigan reversed the bankruptcy court order, and both parties appealed to the Sixth Circuit Court of Appeals. The Sixth Circuit affirmed the district court order. *Id.* at 1135.

{¶ 22} In addressing preemption, the *Wolverine* court found that Michigan's experience rating system was part of the "comprehensive federal-state system" established under the Federal Unemployment Tax Act to protect the unemployed and that there is nothing in the Bankruptcy Code that clearly evidences intent "to preempt state attempts to assign liability for employment history to successor purchasers." *Id.* at 1147. With regard to the meaning of "any interest," as used in 11 U.S.C. 363(f), the Sixth Circuit noted that the term is not defined in the Bankruptcy Code. *Id.* at fn. 23. Accordingly, for purposes of determining whether a debtor's unemployment tax experience rate may be imposed on a purchaser of assets through a bankruptcy sale, the *Wolverine* court made the following pronouncement: "[W]hile 11 U.S.C. § 363(f) provides that property may be sold 'free and clear of any interest in such property,' we do not perceive the experience history of Wolverine as an 'interest' that attaches to property ownership so as to cloud its title." *Id.* at 1147. The *Wolverine* court explained that "application of the rate creates a fund which is to be used prospectively and, in assessing JOSI's contribution rate, MESC is not attempting to collect a pre-petition debt." *Id.* at 1148.

{¶ 23} In *Wolverine*, the Sixth Circuit articulated justifiable reasons why a debtor's experience rating should not be considered an "interest" in the debtor's property that may be extinguished by the asset purchase:

> While the unemployment history of a debtor may more appropriately be characterized as "belonging" to a debtor in possession than to a purchaser of the debtor's assets, if the Bankruptcy Code does not preempt state law regarding the tax liability of debtors-in-possession, then we see no reason why federal law should extend greater protection to nondebtors. In both situations, the unemployment tax liability arises only by virtue of the successor entity's post-petition employment of workers. The tax liability sought to be imposed on JOSI by MESC bears no relationship to Wolverine's status as a debtor involved in bankruptcy proceedings, and no one argues that MESC could not use Wolverine's experience rating had Wolverine not sold its assets to JOSI. We see no reason to hold that the Bankruptcy Code provides JOSI with a more

> preferable tax rate than employers who purchase the assets of
> a predecessor not in bankruptcy.

*Id.* at 1149.

{¶ 24} Here, as was the case in *Wolverine*, the unemployment tax liability sought to be imposed on Senco Brands is unrelated to Senco Products' status as a debtor involved in bankruptcy proceedings. Senco Brands also makes no claim that ODJFS could not have used Senco Products' experience rating in calculating Senco Products' unemployment tax liability had Senco Products not sold its assets to Senco Brands. Here, as was the case in *Wolverine*, Senco Brands' unemployment tax liability arises entirely out of Senco Brands post-purchase employment of workers. And, after the sale of assets, Senco Brands employed 275 of Senco Products' 284 former employees. Additionally, the Ohio unemployment compensation laws at issue in this case are similar to the Michigan laws considered by the *Wolverine* court. Under Michigan law, the question whether a transfer of all or part of an employer's business results in a transfer of the seller's unemployment experience to the buyer depends on the buyer's post-purchase conduct and not merely the purchase of the assets.[5] Under R.C. 4141.24(G)(1), the transfer to the purchaser of the seller's unemployment experience arises primarily out of substantially common ownership, management, or control and not the purchase of assets.

{¶ 25} The *Wolverine* court's focus on the buyer's post-purchase conduct in determining whether 11 U.S.C. 363(f) preempts state unemployment compensation laws is also consistent with well-settled concepts of successor liability under the common law. In Ohio, a corporation that purchases the assets of another may be liable for obligations of its predecessor if the buyer corporation is merely a continuation of the seller

---

[5] Mich. Comp. Laws Ann. § 421.22 provides, in relevant part, as follows:

> (a) If an employer subject to this act transfers any of the assets of the business by any means otherwise than in the ordinary course of trade and there is not substantially common ownership, management, or control of the transferor and the transferee, the transfer shall be deemed a "transfer of business" for the purposes of this section if the commission determines both of the following:
>
> * * *
>
> (2) That the transferee has acquired and used the transferor's trade name or good will, or that the transferee has continued or within 12 months after the transfer resumed all or part of the business of the transferor either in the same establishment or elsewhere.

corporation. *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346 (1993), citing *Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60 (1987). *See also* Rachel P. Corcoran, *Why Successor Liability Claims are not "Interests in Property" Under Section 363(F)*, 18 Am. Banker. Inst. L. Rev. 697 (Winter, 2010).[6] In this instance, Senco Brands continued to engage in the same business as former Senco Products and with essentially the same workforce.

{¶ 26} Because the *Wolverine* case has been the prevailing rule of law in the Sixth Circuit for more than 25 years and because this court is persuaded that the *Wolverine* decision is both well reasoned and compatible with the comprehensive federal-state system providing for the security of unemployed workers, we hereby adopt the rule of law in *Wolverine* for purposes of determining preemption in this case. Given the statutory scheme for determining the transfer of unemployment experience in Ohio and the particular facts of this case, we find that the definition of "any interest in the [debtor's] property" adopted in *Wolverine* represents the better approach. Because the facts of this case are very similar to those considered by the Sixth Circuit in *Wolverine,* the application of the rule of law in *Wolverine* requires the same result. Under *Wolverine*, Senco Products' unemployment experience rating is not an "interest" in Senco Products' assets for purposes of 11 U.S.C. 363(f). Consequently, even though the bankruptcy order and the asset purchase agreement affected the transfer of Senco Products' assets to Senco Brands free and clear of any interest in such property, the bankruptcy order does not preempt the determination by ODJFS that Senco Brands is a successor-in-interest to Senco Products under R.C. 4141.24(G)(1).

{¶ 27} In advocating preemption, Senco Brands asks this court to adopt an expansive definition of "any interest in [debtor's] property" that has been adopted in other circuits. The First Circuit Court of Appeals' decision in *OPK Biotech* is typical of cases adopting this view in the context of unemployment experience.[7] In *OPK Biotech*, the

---

[6] "[I]t is not the transferred property that gives rise to the successor liability claim, but rather it is the purchaser's actions subsequent to the purchase of that property that imposes liability. * * * Nor is it questioned that a successor liability claim does not 'have an existence independent of the underlying liability of the entity that sold the assets.' But, this does not alter the character of a successor liability claim as simply an *in personam* claim against the purchaser of assets that has met the criteria for imposition of successor liability, such as through express assumption of liability or by acting as a mere continuation of the seller." (Emphasis sic.) *Id*. at 733.

[7] Other than the First Circuit in *OPK Biotech,* several bankruptcy court decisions within the Second Circuit have also adopted the expansive view of "any interest" in holding that 11 U.S.C. 363(f) preempts a

Massachusetts Department of Unemployment Assistance ("DUA") challenged a decision of the United States Bankruptcy Court for the District of Massachusetts that, pursuant to 11 U.S.C. 363(f), PBBPC sold its assets to OPK free and clear of any interest therein, including the DUA's right to tax the purchaser at the debtor's unemployment contribution rate. *Id.* at 862. The First Circuit Court of Appeals upheld the decision. The First Circuit in *OPK Biotech* determined that the term "any interest" as used in 11 U.S.C. 363(f) is not limited to *in rem* interests in property but should be interpreted expansively to include other obligations that may flow from ownership of the property. *OPK Biotech* at 868, citing *Lecki* at 582.[8] Applying the expansive definition, the First Circuit held that 11 U.S.C. 363(f) preempted DUA's application of PBBPC's experience rate. The court reasoned as follows:

> [T]he transfer of an employer's contribution rate to a successor asset purchaser is really an attempt to recover the money that the predecessor employer would have paid if it had continued in business. The liability for the increased rate thus follows any purchase of substantially all of the assets of an employer. The transfer of those assets alone, not the continuation of the Debtor's business, is sufficient to trigger the imposition of successor liability on a purchaser.

*OPK Biotech* at 869, citing *Trans World Airlines, Inc.* at 289, 293.

{¶ 28} Although the court in *OPK Biotech* expressly rejected the rationale of the Sixth Circuit decision in *Wolverine,* the court in *OPK Biotech* failed to explain how the state's claim for lost premium revenues owed by the buyer could have been asserted as a claim against the property of the debtor in bankruptcy. *See* Karen Cordry, *First Glance: Affairs of State, Rethinking § 363 Sales: ABI Commission Steps Back from Brink*, 34-7 ABIJ 20 (July, 2015). Furthermore, under the state law at issue in *OPK Biotech*, the asset-purchaser's post-sale conduct had no bearing on the decision to transfer the debtor's experience rate to the asset-purchaser. *Id.* at 869. *See also* Steven J. Boyajian, *Code to Code, The Transfer of Unemployment Insurance Experience Rates*, 32-8 ABIJ 24 (September, 2013). Conversely, under Ohio law, substantially common ownership,

---

transfer of a debtor's unemployment experience to the asset purchaser under state law. *See*, *e.g.*, *In re USA United Fleet Inc.*, 496 B.R. 79, 89 (Bankr. E.D.N.Y.2013); *In re Tougher Indus., Inc.*, 479 B.R. 79 (Bankr. N.D.N.Y.2013); *In re Old Carco LLC*, 538 B.R. 674, 677 (Bankr. S.D.N.Y.2015).

[8] The First Circuit noted that the bankruptcy court referred to the debtor's unemployment experience rate as an "atypical" interest in the debtor's property. *Id.* at 862.

control, or management after the transfer of the debtor's business is the primary factor that determines the buyer's unemployment insurance rates under R.C. 4141.24(G)(1). Thus, the justification for adopting an expansive definition of "any interest in the [debtor's] property," under 11 U.S.C. 363(f), does not exist in this case.

{¶ 29} Moreover, Senco Brands has not advanced a compelling reason why it should receive a preferable tax rate to those Ohio employers who purchase the assets of a predecessor not in bankruptcy.  The justification for preferential treatment most often cited by courts adopting the expansive definition of the term "any interest" is that it maximizes a debtor's property value and provides flexibility to the bankruptcy trustee to arrange a quick sale while disposing of competing interests in the property.  *BioTech* at 870.  *See also In re USA United Fleet, Inc.*, 496 B.R. 79, 89 (Bankr. E.D.N.Y. 2013); *In re Tougher Industries, Inc.*, 469 B.R.79 (Bankr. N.D.N.Y.2013).  In *OPK Biotech*, the court specifically found that "the possibility of transferring assets free and clear of successor liability was a critical inducement to the sale."  *Id.* at 870.[9]

{¶ 30} In advocating the rejection of *Wolverine,* Senco Brands argues that "had Senco Brands known that it was also acquiring the Senco Products unemployment payroll tax rate, a significant added expense, this information would have surely diminished the sales price that Senco Brands would be willing to pay."  (Appellant's brief at 16.)  The evidence in the record belies Senco Brands' claim.  As noted above, it is not disputed that Senco Brands began paying premiums at the higher rate immediately after the sale and continued to make payments at the higher rate for more than three years before learning of its reporting error.  Had the acquisition of Senco Products' assets free and clear of Senco Products' unemployment experience truly been a motivating factor to Senco Brands, it is unlikely that the reporting error would have gone unnoticed for so long.  On this record, the ODJFS determination does not frustrate the policy concerns underlying 11 U.S.C. 363(f).

{¶ 31} Senco Brands next attempts to distinguish *Wolverine* on the basis that the language of the bankruptcy order and asset purchase agreement at issue in this case is broader than the language considered by the court in *Wolverine.*  For example, Senco Brands cites section 9 of the bankruptcy order, which states that "the Assets shall be transferred * * * free and clear of all Interests and Encumbrances * * * including, but not

---

[9]  Because PBBPC had laid off nearly all of its employees prior to closing the sale, its experience rating was very high, which resulted in an unemployment contribution rate of 12.27 percent.

limited to, * * * state unemployment compensation laws." Senco Brands also relies on section 32 of the bankruptcy order which states that "under no circumstances shall the Buyer be deemed a successor of or to the Debtors for any Interest or Encumbrances * * * of any kind or nature whatsoever." Senco Brands claims that the above-cited provisions of the bankruptcy order evidence the Bankruptcy Court's intention to preempt UCRC's determination that Senco Brands is a successor-in-interest to Senco Products for purposes of Ohio unemployment taxes.

{¶ 32} Although the language employed in the bankruptcy order and asset purchase agreement evidence an intent to extinguish any and all competing interests in the debtor's property on confirmation, because Senco Product's unemployment experience is not an "interest" that attaches to property ownership so as to cloud its title, neither the bankruptcy order nor the asset purchase agreement extinguish Senco Products' experience rating. As a result, the "free and clear" language used in section 9 of the bankruptcy order does support Senco Brands' claim that the bankruptcy court intended to preempt the ODJFS determination in this case. Similarly, the term "any interest" in section 32 modifies the prohibition against successor liability under the bankruptcy order. Thus, the language of section 32 does not support Senco Brands' claim that the bankruptcy order preempts the ODJFS determination.

{¶ 33} Senco Brands next contends that the definition of "Encumbrance" in the asset purchase agreement extinguishes any successor liability arising from the asset purchase. Under the asset purchase agreement, an "encumbrance" is defined as "any * * * Tax * * * or any claim based on any theory that Buyer is a successor, transferee or continuation of Sellers or the Business." (UCRU Record of Proceedings, Asset Purchase Agreement at 6-7.)

{¶ 34} The *Wolverine* court specifically stated: "we do not perceive Wolverine's experience rating as attaching to any 'property' dealt with by the plan, or as a 'claim' or 'debt' arising before confirmation." *Id.* at 1147. Applying the logic of *Wolverine* herein, Senco Products unemployment experience rating is not a "claim" or "debt" arising prior to sale and cannot, therefore, be a claim based on a theory that Senco Brands is a successor. Additionally, as ODJFS has argued, there is a material difference between a tax liability and a tax rate. There is no question that a pre-petition tax liability may be asserted as a claim against the debtor's property in bankruptcy, whereas a claim by ODJFS against

Senco Brands for future unemployment insurance premiums could never be asserted as a claim against Senco Products in the bankruptcy. *See* Cordry, *supra.* Under Ohio law, the application of the rate merely creates a fund which is to be used prospectively, and in assessing Senco Brands' contribution rate, ODJFS is not attempting to collect a pre-petition debt. *See Wolverine* at 1148.

{¶ 35} Furthermore, to the extent that Senco Brands argues that successor liability is itself an "interest" in the debtor's property, we note that the cases adopting such a view are the same cases that have adopted the expansive definition of "any interest in the [debtor's] property" under 11 U.S.C. 363(f). *See Chrysler, LLC*; *Trans World Airlines, Inc.*; *Leckie.* In this decision, we have expressed our reasons for adopting *Wolverine* and rejecting the expansive definition of "any interest in the [debtor's] property" adopted by other federal circuit courts. For the same reasons, we also reject the view that successor liability is itself an "interest" in the debtor's property for purposes of 11 U.S.C. 363(f). *See* Corcoran, *supra*, at 733 ("By failing to recognize the very nature of successor liability claims as derivative of the seller's liability but also requiring action on the part of the purchaser, the decisions of the Second, Third and Fourth Circuit Courts of Appeals are unconvincing.").[10]

{¶ 36} Senco Brands argues, in the alternative, that the Sixth Circuit rejected *Wolverine* in *Al Perry Ents., Inc. v. Appalachian Fuels, LLC*, 503 F.3d 538, 543 (6th Cir.2007). Our review of *Al Perry Ents.* reveals that the case involves a pre-petition "claim" against the estate and does not address the meaning of "any interest" under 11 U.S.C. 363(f), nor does the case cite *Wolverine.* Consequently, we do not interpret *Al Perry Ents.* as a rejection of the prior Sixth Circuit ruling in *Wolverine.*

{¶ 37} For the foregoing reasons, we hold that 11 U.S.C. 363(f) and the bankruptcy order did not preempt the ODJFS determination that Senco Brands is a successor-in-interest to Senco Products for purposes of Senco Brands' unemployment compensation insurance rate. Accordingly, Senco Brands' first assignment of error is overruled.

**B. Successor-In-Interest**

{¶ 38} Having determined that the bankruptcy order did not preempt the ODJFS determination that Senco Brands is a successor-in-interest to Senco Products, we must

---

[10] Criticizing *Chrysler, LLC*; *Trans World Airlines, Inc.*; *Leckie.* Corcoran, *supra*, at 733 (2010), citing *Chrysler, LLC*; *Trans World Airlines, Inc.*; *Leckie.*

now consider whether the trial court abused its discretion when it concluded that competent, credible evidence supported the UCRC order and that such order was in accordance with law. In Senco Brands' second and third assignments of error, Senco Brands argues that the trial court erred when it upheld the UCRC determination that Senco Brands is a successor-in-interest to Senco Products pursuant to R.C. 4141.24(G)(1). Accordingly, we will address the second and third assignment of error together.

{¶ 39} R.C 4141.24(G)(1) provides, in relevant part, as follows:

> If an employer transfers its trade or business, or a portion thereof, to another employer and, *at the time of the transfer, both employers are under substantially common* ownership*, management,* or control, then the unemployment experience attributable to the transferred trade or business, or portion thereof, shall be transferred to the employer to whom the business is so transferred.

(Emphasis added.)

{¶ 40} In ruling that Senco Brands was a successor-in-interest to Senco Products, the UCRC hearing officer found as follows:

> The Board of Directors of Senco Holdings and Senco Brands were the same. One individual from the SENCORP family was on both Boards of Directors. This individual was Peter van der Wel. He was also President and CEO of Senco Brands. The rest of the directors on both Boards of Directors were not from SENCORP or its affiliates.
>
> At the time of transfer, the vast majority of the officers for Senco Brands came from either Senco Products or from the SENCORP family of affiliates. These individuals were brought in to operate and manage the company on a day-to-day basis. They were brought in because of their expertise in the fastening business which both Senco Products and Senco Brands were engaged. These individuals provided management services to Senco Products prior to the transfer.
>
> The individuals who were on the day-to-day management team included the President/CEO, an Executive Vice President, and five other Vice Presidents. One individual was also a Vice President and Assistant Secretary. This individual did not come from the SENCORP family. These individuals operated the business on a day-t0-day basis and managed the operations of Senco Brands.

(UCRC Record of Proceedings, Ex. A at 5.)

{¶ 41} Based on these factual findings, the UCRC hearing officer concluded that Senco Brands is under substantially common management to former Senco Products. Further support for the hearing officer's determination is found in the testimony of Carl Prideau, the assistant section chief within the contribution section of UCRC. Prideau testified that section 8.4 of the asset purchase agreement required Senco Brands to offer employment to each member of the seller's "Senior Management," and "substantially all other Employees of Sellers at the same location and on substantially similar terms." (Tr. Vol. I at 32; Asset Purchase Agreement at 52.) According to Prideau, ODJFS' records showed that after the transfer of Senco Products' business to Senco Brands, Senco Brands employed 275 of Senco Products' 284 former employees. (Tr. Vol. I at 32.) Prideau stated that ODJFS' records also show that Senco Products ceased to be an Ohio employer "some time in the third quarter of 2009." (Tr. Vol. I at 25.)

{¶ 42} Senco Brands does not contend that the hearing officer's determination regarding the commonality of corporate officers is erroneous, nor does Senco Brands argue that ODJFS' records conflict with Prideau's testimony. Rather, the argument advanced by Senco Brands in this appeal is that the management of Senco Brands resides exclusively with the board of directors, and because only one former Senco Products' board member sits on Senco Brands' six-member board of directors, the evidence does not support UCRC's conclusion that the two companies are under substantially common management. We disagree.

{¶ 43} It is clear from the decision that the hearing officer focused exclusively on the management of Senco Brands' business in determining whether Senco Brands was a successor-in-interest to Senco Products, rather than the ownership or control of the two businesses. It is axiomatic that "[w]ords not defined in a statute must be afforded their common and ordinary meaning." *Harbour v. Ridgeway*, 10th Dist. No. 04AP-350, 2005-Ohio-2643, ¶ 27, citing *Kimble v. Kimble*, 97 Ohio St.3d 424, 2002-Ohio-6667, ¶ 6. It is also true that "[t]he word 'or' is primarily used as a disjunctive, and '[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise.' " *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 51, quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). *See also* R.C. 1.42. The word "management," as used in R.C. 4141.24(G)(1), is not defined in R.C. Chapter 41, and the reported cases arising under subsection (G)(1) are not

instructive on the meaning of the term "management" as used in the statute.[11] Consequently, the parties have submitted various dictionary definitions of "management" in support of their respective positions on the issue.

{¶ 44} Black's Law Dictionary defines "management," in relevant part, as follows:

> The people in an organization who are vested with a certain amount of discretion and independent judgment in managing its affairs. **c-level management.** * * * Collectively the officers of an organization holding titles prefixed by "chief"; the upper tier of top management, * * * **middle management**. Company employees who exercise some discretion and independent judgment in carrying out top management directives. **Top management.** A high level of company management at which major policy decisions and long-term business plans are made.

(Emphasis sic) *Black's Law Dictionary*, 1104 (10th Ed.2014).

{¶ 45} The term "manager" is defined, in relevant part, as follows:

> 1. Someone who administers or supervises the affairs of a business. **general manager.** A manager who has overall control of the business. A general manager is usu. is equivalent to a president or chief executive officer of a corporation. **line manager**. 1. A corporate manager who is responsible for the main activities of production, sales, etc. 2. Someone who is one level higher in rank than another and is in charge of that person's work.

*Id.* (Emphasis sic.)

{¶ 46} The definition of "management" and "managers" does not include members of a corporate board of directors, whereas a corporate officer may be considered "c-level management" or a "general manager."[12] Rather, a "Board of Directors" is defined as "[t]he governing body of a corporation * * * elected by the shareholders or members to establish policy, elect or appoint officers and committees, and make other governing decisions." *Id.* at 208. "Control" is defined, in relevant part, as "[t]he direct or indirect power to *govern the management and policies* of a person or entity." (Emphasis added.) *Id.* at 403. Based on these commonly accepted definitions, a corporate board of directors

---

[11] See *Valentine Contrs., Inc. v. Dir., Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 15AP-86, 2015-Ohio-5576, and *AWL Transp., Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 15AP-674, 2016-Ohio-2954.

[12] A "Corporate officer" is "an officer of a corporation such as a CEO, president, secretary, or treasurer." *Black's Law Dictionary*, 1257 (10th Ed. 2014).

is the governing body of a corporation that has the power to appoint corporate officers and control management personnel. Thus, the board of directors of a corporation is more closely associated with corporate control than with the day-to-day management of operations.

{¶ 47} In support of its claim that Senco Brands' management resides exclusively in the board of directors and not its officers and subordinates, Senco Brands relies on the testimony of Corporate Director, Ian Kirson. Kirson testified at the hearing as follows:

> Mr. Reed: Mr. Kirson, in terms of the officers, um, if an officer gets removed, who makes that decision?
> Mr. Kirson: Again, the board makes the determination. We work in cooperation with the CEO, obviously, but we make the determination at the board level.
>
> Mr. Reed: And, if an officer wants to take a specific action, is that something that, uh, they have to have a board of director approval to do?
>
> Mr. Kirson: Uh, we have delegation of authority, matrixes, and there are certain levels of activity that people can take, um, at their own and there are certain levels of activity *when you get to stuff that actually impacts direct strategy and control over the organization then we bring it up to the board level.*

(Emphasis added.) (Tr. Vol. II at 14-15.)

{¶ 48} Senco Brands also relies on the testimony of Vice President, Cliff Mentrup, who stated the board of directors controlled Senco Brands' operations:

> Mr. Reed: I am going to ask you to look at just the directors, uh, oh this document. Can you tell us who those are?
>
> Mr. Mentrup: Peter Vanderwell, Frank Hayes, Charles Grace, Ian Kirson, Steve Wellborn, and Frank Rocca.
>
> * * *
>
> Q: So, I have a different question for you. Um, who controls Senco Brands in terms of the ownership?
> A: Whynnchurch Capital.
> Q: All right. And what about the management of Senco Brands? Who are the managers?
>
> A: Uh, management is controlled by Wynnchurch. The managers are, are listed here, at that time.

Q:  Thank you.  So, who gets to appoint the managers of the corporation, Senco Brands?

A:  Essentially, uh, Wynnchurch and the board.

Q:  Thank you.  And, the board is, uh, the individuals you previously identified?

A:  Correct.

(Emphasis added.)  (Tr. Vol. II at 95.)

{¶ 49} Given the commonly recognized definition of a board of directors and in consideration of the testimony relied on by Senco Brands, the evidence supports the conclusion that Senco Brands' board of directors represents the governing authority of Senco Brands and that the board of directors exercises a significant degree of control over company strategy and policy.  The board of directors also has the power to appoint and dismiss corporate officers.  Though both Kirson and Mentrup opined that the board of directors managed Senco Brands, it is reasonable to infer from their testimony that the board of directors exercised control over the management personnel but did not engage in the day-to-day management of corporate operations.  Contrary to Senco Brands' assertion, the testimony of Kirson and Mentrup does not support a finding that the day-to-day management of Senco Brands rests with the board of directors, rather than the corporate officers and their subordinates.  Kirson also testified as follows:

Q:  I want to ask you about the other theory.  The other theory is that the Department of Jobs and Family Services has said that, uh, both employers, that is Senco Products and Senco Brands were under substantially common ownership, management, or control.  So, my question is, Mr. Kirson, uh, using the facts, uh, that you have gathered in the course of your job as a director for Wynnchurch Capital, do you have an opinion as to whether or not there was substantially common ownership with regards to the two companies?

A:  Absolutely not, there was no common ownership at all.

Q: Thank  you,  Mr.  Kirson.  What  about  common management?

A: *Uh, no management is managed by the people that the board puts in place.*  We were a brand new board that we put in place.  We had, uh, I believe, there was one member that

overlapped between the old board and the new board, but no, we were five of the six Directors, we were brand new, *we appointed our slate of officers, and controlled the direction and management of the company.*

(Emphasis added.)  (Tr. Vol. II at 13.)

{¶ 50} Administrative agencies have discretion to promulgate and interpret their own rules, and a reviewing court should give due deference to statutory interpretations by an administrative agency that has substantial experience and been delegated enforcement responsibility.  *Id.*, citing *Weiss v. Pub. Util. Comm.*, 90 Ohio St.3d 15, 17-18 (2000), citing *Collinsworth v. W. Elec. Co.*, 63 Ohio St.3d 268, 272 (1992).  In determining whether Senco Brands was a successor-in-interest to Senco Products, the hearing officer focused on the commonality of individuals responsible for management of the day-to-day operation of the business, rather than a commonality of the individuals who have control over management personnel.  We cannot say that the hearing officer's interpretation of "substantially common management" is inconsistent with the intent of the statute.

{¶ 51} The hearing officer found that management of Senco Brands resided in the "management team" which consisted of corporate officers including the president/CEO, an executive vice president, and five other vice presidents.  The hearing officer further found that these individuals managed the day-to-day operation of Senco Brands and that these individuals were previously employed either by Senco Products or its parent company.  Based on our review of the record, we find that there is competent, credible evidence to support the conclusion that Senco Brands and Senco Products are under substantially common management after the transfer of the business.  We further find that such a conclusion is in accordance with the relevant statutory law.  Accordingly, we hold that the trial court did not abuse its discretion when it affirmed the UCRC decision.

{¶ 52} For the foregoing reasons, Senco Brands' second and third assignments of error are overruled.

## C.  Quashing the Subpoena

{¶ 53} In the fourth assignment of error, Senco Brands argues that the trial court erred by upholding UCRC's decision to quash Senco Brands' subpoena.  The subpoena sought ODJFS' records pertaining to other Ohio employers who had contributions refunded after ODJFS corrected an erroneous successor-in-interest determination.  Senco Brands claims that "[t]his information would have been important because it likely would

have shown the disparate treatment of Senco Brands by ODJFS." (Appellant's Reply Brief at 16.)

{¶ 54} R.C. 4141.21 protects the confidentiality of information collected and held by ODJFS, in relevant part, as follows:

> [T]he information maintained by the director of job and family services or furnished to the director by employers or employees pursuant to this chapter is for the exclusive use and information of the department of job and family services in the discharge of its duties and shall not be open to the public or be used in any court in any action or proceeding pending therein, or be admissible in evidence in any action. All of the information and records necessary or useful in the determination of any particular claim for benefits or necessary in verifying any charge to an employer's account under sections 4141.23 to 4141.26 of the Revised Code shall be available for examination and use by the employer and the employee involved or their authorized representatives in the hearing of such cases.

{¶ 55} R.C. 4141.21 prohibits information furnished to ODJFS from being admitted in a court proceeding other than a proceeding involving the determination of any particular claim for benefits or in verifying any charge to an employer's account under R.C. 4141.23 to 4141.26. *See Pasanovic v. Am. Gen. Fin., Inc.*, 10th Dist. No. 92AP-651 (Sept. 17, 1992). Senco Brands argues that the statute does not prohibit ODJFS from providing it with records pertaining to other Ohio employers because that information may be necessary in verifying a charge to Senco Brands' account.

{¶ 56} "The purpose of statutory construction is to discern the actual meaning of the statute." *Portage Cty. Bd. of Commrs. v. Akron*, 109 Ohio St.3d 106, 2006-Ohio-954, ¶ 52, citing *First Natl. Bank of Wilmington v. Kosydar*, 45 Ohio St.2d 101, 106 (1976). We find that Senco Brands' expansive interpretation of R.C. 4141.24 is not consistent with the actual meaning of the statute, which is to permit ODJFS to make otherwise confidential employment records available to a particular employee or employer about whom the records are made and only in connection with the determination of that particular employee's claim for benefits or in verifying any charge to that particular employer's account. Senco Brands does not cite any case law interpreting the statute in such an expansive manner and this court has not found any. Moreover, Senco Brands fails to adequately explain how the alleged disparity of treatment by ODJFS in relation to other

employers would be relevant to the determination of Senco Brands' status as a successor-in-interest to Senco Products in this particular case.

{¶ 57} For the foregoing reasons, the fourth assignment of error is overruled.

## V. CONCLUSION

{¶ 58} Having overruled each of Senco Brands' assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and SADLER, J., concur.

_____